**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tyandrah Ashley, | No. CV-22-00163-TUC-EJM |
| Plaintiff, | |
| v. | **ORDER** |
| Kilolo Kijakazi,<br>Acting Commissioner of Social Security, | |
| Defendant. | |

Currently pending before the Court is Plaintiff Tyandrah Ashley's Opening Brief (Doc. 18). Defendant filed her Answering Brief ("Response") (Doc. 19), and Plaintiff replied (Doc. 23). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Compl. (Doc. 1). Based upon the pleadings of the parties and the administrative record submitted to the Court, the Magistrate Judge denies Plaintiff's Opening Brief (Doc. 18).

## I.    BACKGROUND

### A.    *Procedural History*

On July 4, 2020, Plaintiff protectively filed a Title II application for Social Security Disability Insurance Benefits ("DIB"), as well as a Title XVI application for Supplemental Security Income ("SSI") alleging disability as of June 27, 2020, due to Bipolar I disorder, psychotic features, and anxious distress. *See* Administrative Record ("AR") at 30–33, 86–

87, 89, 97–98, 100, 102, 108, 110, 112, 114, 116, 118–19, 130–31, 134, 340, 359, 361.[1] The Social Security Administration ("SSA") denied these applications on July 30, 2020. *Id.* at 30, 86–112, 142–49.  On August 3, 2020, Plaintiff filed a request for reconsideration. *Id.* at 154–55.   On August 13, 2020,[2] SSA denied Plaintiff's application upon reconsideration.  *Id.* at 30, 116–41, 156–63.  On November 6, 2020, Plaintiff filed her request for hearing.  *Id.* at 30, 170–71.  On April 6, 2021, a telephonic hearing was held before Administrative Law Judge ("ALJ") Elizabeth Ebner.  AR at 30, 47–67.  On April 16, 2021, the ALJ issued an unfavorable decision.  *Id.* at 27–39.  On June 15, 2021, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on November 4, 2021, review was denied.  *Id.* at 1–6, 392–94.  On April 5, 2022, Plaintiff filed this cause of action.  Compl. (Doc. 1).

### B.    Factual History

Plaintiff was twenty-eight (28) years old at the time of the alleged onset of her disability and twenty-nine (29) years old at the time of the administrative hearing.  AR at 30–32, 38, 47, 53–54, 68, 70, 72, 86–87, 89, 97–98, 100, 108, 110, 112, 114, 116, 118–19, 130–31, 134, 210, 252, 291, 300, 340, 359, 361.  Plaintiff is a high school graduate with a bachelor's degree, as well as some work toward advanced degrees.  *Id.* at 38, 68, 53–54, 68, 70, 108, 110, 112, 114, 116, 335.  Prior to her alleged disability, Plaintiff worked as a community helper, customer service representative in various technology industries, after school program developer, and management trainee.  *Id.* at 50–51, 55–57, 58–59, 286–88, 322–32, 335.

### 1.  Plaintiff's Testimony

#### a.  Administrative Hearing

At the administrative hearing, Plaintiff confirmed that she had a bachelor's degree

---

[1] Page numbers refer to the page numbers demarcated in the Administrative Record rather than the Court's Case Management/Electronic Case Files ("CM/ECF") page numbers.

[2] August 13, 2020 is the date that SSA adjudicators signed off on the denial of Plaintiff's claim, but the letters from the agency informing Plaintiff of the denial were dated September 3, 2020.

and was taking an online course toward a master's degree in finance. AR at 53–54. Plaintiff also confirmed that she had previously taken classes for a couple of months toward a Master of Business Administration degree. *Id*. at 54. Plaintiff described her most recent work to include kitchen staff at Eegee's, deli clerk at Strauss,[3] and Red Lobster. *Id.* at 54–56. Plaintiff worked at these jobs for a few days to approximately four (4) months. *Id.* Plaintiff testified that she worked for approximately three (3) call centers, and the duties in each position were broadly similar. *Id.* at 54. Plaintiff described these positions as sitting jobs that did not require any lifting. AR at 56. Plaintiff further testified that in 2015 she worked for AmeriCorps as an after school program developer. *Id.* at 57. Plaintiff explained that the AmeriCorps position involved standing, sitting, and lifting, but her primary responsibility was planning the lessons for an after school program and working directly with the children. *Id.* at 57–59. Following her time at AmeriCorps, Plaintiff went to work at America Eagle as a manager in training for approximately four (4) months. *Id.* at 57–58. Plaintiff described the American Eagle position to include training the staff, processing incoming shipments, folding clothes, talking to customers, opening and closing the cash register, and putting up new displays and marketing. *Id.* at 58. Plaintiff indicated that she worked at AmeriCorps during her senior year of college. AR at 58.

Plaintiff testified that she currently sees a therapist once every two weeks and her psychiatrist once every two (2) months. *Id.* at 59. Plaintiff estimated that she reduced her therapy from once a week to biweekly approximately one (1) year ago. *Id.* Plaintiff further testified that she had been seeing her psychiatrist every two (2) months since she began seeing him. *Id*. at 60. Plaintiff confirmed that she has seen improvement through treatment. *Id.*

Plaintiff testified that she has gained personal satisfaction and understanding regarding her life, as well as greater stability and improved relationships, through treatment. AR at 60. Plaintiff described trying to find a job that fits as the main issue that

---

[3] The hearing transcript states "Strauss"; however, a review of the record indicates that Plaintiff was working at Sprouts grocery store.

she continues to struggle with in therapy.  *Id.*  Plaintiff acknowledged that different jobs had different reasons for not working out.  *Id.*  Plaintiff explained that Red Lobster would not allow her a break, at Sprouts she had reduced hours following her mental health break, and at Anderson Financial it was very stressful and she could not focus.  *Id.* at 60–61. Plaintiff testified that some of her symptoms go in cycles.  *Id.* at 61.  Plaintiff described having difficulty sleeping, which becomes so severe, approximately once a year, that she cannot sleep even with medication and can cause suicidal ideation.  AR at 61.  Plaintiff further testified that her anxiety has reduced and fluctuates less as a result of her stable support system and ongoing medication compliance.  *Id.*  Plaintiff denied having any issues with medication compliance, and opined that the medications were the most important aspect of her treatment to maintain stability.  *Id.* at 61–62.  Plaintiff also indicated that her art program was still going well.  *Id.* at 62.  Plaintiff opined that she felt that a low stress job, isolated from people, would cause her to become depressed.  *Id.*  Plaintiff further opined that she requires interaction with others to maintain her stability in the workplace. AR at 62.  Plaintiff doubted that she would be able to maintain a simple job for more than two (2) weeks, even with some interaction with people.  *Id.* at 63.

### b.  Administrative Forms

#### i.  *Work History Report*

##### a.  July 9, 2019

On July 9, 2019, Plaintiff completed a Work History Report.[4]  AR at 322–32. Plaintiff listed her prior work a Big Brother Big Sister community helper, customer service representative in technology sales, dictating for the hearing impaired, and customer service in fitness.  *Id.* at 322.  Plaintiff described the position at Big Brother Big Sister as full-time—eight (8) hours per day, five (5) days per week.  *Id.* at 323.  Plaintiff reported earning $32,000.00 per year, without any further information regarding this position.  *Id.*  Plaintiff described the position of customer service representative at Cox Communications as full-

---

[4] The Work History Report form appears undated; however, the Agency's Exhibit List provides a date.  AR Exhibit Index (Doc. 17-7) at 1 (refers to CM/ECF page number).

time—eight (8) hours per day, five (5) days per week. *Id.* at 324. Plaintiff reported earning $12.00 per hour, without any further information regarding this position. AR at 324. The next customer service job, Plaintiff described as full-time—eight (8) hours per day, five (5) days per week. *Id.* at 325. Plaintiff reported earning $11.00 per hour, without any further information regarding this position. *Id.* Plaintiff described her position at LA Fitness as full-time—eight (8) hours per day, five (5) days per week. *Id.* at 326. Plaintiff reported earning $10.00 per hour in this position, but did not provide any further details. *Id.* The position at Valley Premaculture Alliance, Plaintiff described as full-time—eight (8) hours per day, five (5) days per week. AR at 327. Plaintiff reported earning $26,000.00 per year, without any further details. *Id.*

### b.  March 4, 2021

On March 4, 2021, Plaintiff completed a Work Background form.[5]  AR at 380. Plaintiff reported working at Eegee's doing food preparation, cleaning, and dishes. *Id.*

### ii.  *Function Report—Adult*

On July 27, 2020, Plaintiff completed a Function Report—Adult.[6]  AR at 343–51. Plaintiff reported that she lived in an apartment with family. *Id.* at 343. Plaintiff outlined the limitations that her medical conditions cause as follows:

> I am not able to hold a job for longer than a few months. It limits my ability to be independent and earn income[.]

*Id.* Plaintiff described her usual day to include waking up, performing personal hygiene tasks, then going for an approximately one (1) mile walk. *Id.* at 344. Plaintiff described the remainder of her day to include watching television, getting lunch or going grocery shopping, and relaxing, followed by taking a shower and bed. *Id.* Plaintiff denied caring for other people or pets. AR at 344. Plaintiff noted that prior to the onset of her bipolar disorder, she was able to go to sleep and stay asleep; however, these sleep issues have

---

[5] The Work Background form appears undated; however, the Agency's Exhibit List provides a date. AR Exhibit Index (Doc. 17-7) at 1 (refers to CM/ECF page number).

[6] The Function Report form appears undated; however, the Agency's Exhibit List provides a date. AR Exhibit Index (Doc. 17-7) at 1 (refers to CM/ECF page number).

resulted in hospitalization.  *Id.*  Plaintiff denied any trouble with personal care.  *Id.* at 345.

Plaintiff indicated that she buys her own lunches and eats out often.  *Id.*  Plaintiff reported that she prepares her own meals approximately two (2) to three (3) times per week, and it takes her between thirty (30) to forty-five (45) minutes to cook.  *Id.*  Plaintiff noted that her cooking habits were unchanged.  AR at 345.  Plaintiff indicated that she does laundry and dishes, as well as other cleaning including taking out the garbage and cleaning the bathtub.  *Id.* at 346.  Plaintiff estimated that it takes her approximately thirty (30) minutes to do each task, and she performs them two (2) to three (3) times per week.  *Id.*

Plaintiff reported that she goes outside approximately twice per day.  *Id.*  Plaintiff further reported that she is able to go out alone, and when she is out can walk, drive, and ride a bicycle.  *Id.*  Plaintiff indicated that she shops in stores for home essentials and groceries.  AR at 346.  Plaintiff stated that she shops daily for approximately thirty (30) minutes.  *Id.*  Plaintiff noted that she is able to count change, handle a savings account, and use a checkbook or money orders, but has difficulty paying bills because she is unable to maintain employment.  *Id.* at 347.  Plaintiff denied that her ability to handle money had changed since the onset of her illness.  *Id.*

Plaintiff listed her hobbies to include photography, cycling, going on walks, and watching television.  *Id.*  Plaintiff observed that she does not have the time or ability to do photography, and the heat prevents her from cycling.  AR at 347.  Plaintiff reported walking and watching television daily.  *Id.*  Plaintiff denied engaging in spending any time with others.  *Id.*  Plaintiff noted that prior to the COVID-19 pandemic, she enjoyed volunteering at a nonprofit bike shop.  *Id.*  Plaintiff also denied needing reminders to go places or anyone to accompany her, because she does not go anywhere due to COVID-19.  *Id.*  Plaintiff reiterated that she does not go out for any social activities.  AR at 348.

Plaintiff reported that her illness affects her ability to complete tasks, concentrate, and follow instructions.  *Id.*  Plaintiff indicated that her "conditions do not allow [her] to complete tasks necessary to hold a job longer than a few months."  *Id.*  Plaintiff is right handed.  *Id.*  Plaintiff reported that she can walk a mile prior to needing a rest, and noted

that she can resume walking after twenty (20) minutes of rest.  *Id.*  Plaintiff further reported that she can pay attention for thirty (30) minutes and is able to finish what she starts.  AR at 348.  Plaintiff described being able to follow written and spoken instructions well.  *Id.*  Plaintiff also indicated that she is able to get along with authority figures.  *Id.* at 349.  Plaintiff reported that she is able to handle stress, but noted that it affects her ability to concentrate, socialize, and complete job tasks.  *Id.*

Plaintiff indicated that she wears glasses and/or contact lenses.  *Id.*  Plaintiff described her mother as her caretaker.  AR at 350.  Plaintiff noted that her mother pays her bills and reminds her to take her medication.  *Id.*  Plaintiff observed that "[w]ithout [her] mother and family support, [she] would not be able to make the effort needed to seek employment that would accommodate [her] bipolar disability."  *Id.*

## 2.  Plaintiff's Medical Records

### a.  Treatment Records[7]

On June 2, 2019, Plaintiff was seen at the Crisis Response Center ("CRC") after she had been discharged the previous week.  AR at 680–95.  Plaintiff remained at the CRC until June 4, 2019.  *See id.* at 680–712.  On June 14, 2019, Plaintiff returned to the CRC and was committed for inpatient mental health treatment at Sonora Behavioral Health from June 14, 2019, through June 26, 2019 via petition.  *Id.* at 396–596, 713–22.  During the course of her treatment, Plaintiff consented to voluntary treatment.  *Id.* at 411.  On June 26, 2019, Plaintiff was discharged with a diagnosis of Bipolar I with psychosis.  *Id.* at 403.  Plaintiff's medications on discharge included Lithobid and Risperdal.  AR at 404.

On July 2, 2019, Plaintiff was seen by Ole J. Thienhaus, M.D. at Banner University Medical Center ("Banner UMC") Integrated Whole Health Clinic ("WHC").  *Id.* at 643–45.  Plaintiff reported quitting her "job at a call center because 'it was too stressful.'"  *Id.* at 643.  "Shortly after, she was bothered by strange thoughts (no elaboration other than 'it

---

[7] Although the Court has reviewed the entirety of Plaintiff's medical records, its summary is generally limited to records regarding Plaintiff's mental health treatment after her alleged onset date.

had to do with the president and politics[']), and became profoundly hopeless." *Id.*

On August 16, 2019, Plaintiff again saw Dr. Thienhaus. *Id.* at 641–42. Plaintiff discussed her work plans "after the managerial position she'd hoped for was filled." *Id.* at 642. On September 16, 2019, Plaintiff met briefly with Saren Seeley, MA, BHT at Banner University Medical Center ("Banner UMC") Integrated Whole Health Clinic ("WHC") regarding her recently completed intake for EPICenter. AR at 639–40.

On January 20, 2020, Ms. Seeley called Plaintiff regarding her interest in returning to therapy. *Id.* at 638. On January 22, 2020, Plaintiff spoke with Ms. Seeley for an initial consultation. *Id.* at 636–37. On January 29, 2020, Plaintiff received telehealth services from Ms. Seeley for an individual therapy appointment. *Id.* at 634–35. Plaintiff reported that her job at Red Lobster was going well. *Id.* at 634.

On February 5, 2020, Plaintiff spoke with Ms. Seeley for an individual therapy appointment. *Id.* at 632–33. Plaintiff reported that she had been let go from Red Lobster because "they refused to provide her with any breaks during her 9.5 hour shifts." AR at 632. On February 12, 2020, Plaintiff returned to Ms. Seeley for a telephonic individual therapy appointment. *Id.* at 629–31. Plaintiff reported that she had been hired at Sprouts and discussed the events leading up to "her two 'breakdowns' after graduating from college." *Id.* at 630. On February 20, 2020, Plaintiff spoke with Ms. Seeley ("WHC") for an individual therapy appointment. *Id.* at 627–28. Plaintiff reported that she had started working at Sprouts and had been accepted in the University of Arizona as a business major. *Id.* at 627. On February 26, 2020, Plaintiff received telehealth services from Ms. Seeley for an individual therapy appointment. AR at 625–26. Plaintiff reported enjoying her job and was contemplating which course of study she would pursue. *Id.* at 625. On February 27, 2020, Plaintiff saw Dr. Thienhaus. *Id.* at 623–24. Treatment records indicate that Plaintiff had stopped all medications the previous Fall without a recurrence of symptoms. *Id.* at 623.

On March 11, 2020, Plaintiff again received telehealth services from Ms. Seeley for individual therapy. *Id.* at 620–22. Plaintiff reported that her week had been uneventful

and she was scheduled to begin an MBA program online through Grand Canyon University the following week. AR at 620. On March 25, 2020, Plaintiff spoke with Ms. Seeley for a telephonic individual therapy appointment. *Id.* at 618–19. Plaintiff reported continuing to work at Sprouts and that she was generally doing well. *Id.* at 618.

On April 15, 2020, Plaintiff requested that Ms. Seeley put her therapy appointments on hold. *Id.* at 617. On April 27, 2020, Plaintiff was seen by Dr. Thienhaus. *Id.* at 615–16. Dr. Thienhaus's review of Plaintiff's systems and mental status examination were unremarkable. AR at 615–16. Treatment records indicate that Plaintiff did not exhibit a re-emergence of her mood instability. *Id.* at 615. Dr. Thienhaus listed Plaintiff's ongoing issues to include mood disorder of depressed type, schizophrenia spectrum disorder with a psychotic disorder type not yet determined, and severe manic bipolar 1 disorder with psychotic behavior. *Id.* at 615. Dr. Thienhaus assessed Plaintiff's mood disorder to be in remission. *Id.* at 616.

On May 6, 2020, Ms. Seeley called Plaintiff following Plaintiff's request to resume phone therapy. *Id.* at 614. Ms. Seeley left a message when Plaintiff failed to answer at the time of their scheduled appointment. AR at 614. On May 7, 2020, Plaintiff received telehealth services from Ms. Seeley. *Id.* at 677–79. Plaintiff discussed her previous hospitalization, as well as issues within her family of origin that contributed to her negative beliefs about herself. *Id.* at 677. Ms. Seeley's observations regarding Plaintiff were generally unremarkable. *Id.* at 678. On May 8, 2020, Ms. Seeley received a call from Plaintiff and also spoke with her mother, after which Ms. Seeley and Dr. Thienhaus discussed restarting her antipsychotic medications. *Id.* at 673, 675. On May 11, 2020, Ms. Seeley received a voicemail from Plaintiff's mother requesting a same-day appointment with a psychiatrist, because the weekend had been difficult. AR at 671. Ms. Seeley counseled Plaintiff's mother regarding taking Plaintiff to the CRC versus waiting for a next day appointment with Dr. Thienhaus. *Id.* at 672. On May 12, 2020, Plaintiff received telehealth services from Dr. Thienhaus. *Id.* at 669–70, 792–93. Plaintiff reported having trouble sleeping, and her mother reported behavioral changes that she associated with

prodromal symptoms before a psychotic break.  *Id.* at 669, 792.  Dr. Thienhaus stressed the importance of early intervention and restarting her medications that induced remission last time.  *Id.* at 670, 793.  His observations of Plaintiff were generally unremarkable.  AR at 669–70, 792–93.  On May 13, 2020, Plaintiff received telehealth services from Ms. Seeley.  *Id.* at 666–68.  Plaintiff "reported that she is feeling 'better' after having re-started risperidone and lithium."  *Id.* at 666.  Plaintiff indicated that she took a week off of work to adjust to the medications.  *Id.*  Ms. Seeley's observations regarding Plaintiff were generally unremarkable.  *Id.* at 667.  On May 20, 2020, Plaintiff returned to Ms. Seeley for individual therapy.  AR at 664–65.  Treatment records reflect that Plaintiff was "continuing to take lithium and risperidone as prescribed."  *Id.* at 664.  Plaintiff reported generally doing well.  *Id.* at 664–65.  On May 28, 2020, Ms. Seeley spoke with Plaintiff on the telephone following a no-show appointment the previous day.  *Id.* at 662–663.  Plaintiff reported that her return to work was "good" and that she did not have anything further to talk about at that time.  *Id.* at 662.

On June 4, 2020, Plaintiff received telehealth services from Ms. Seeley.  AR at 659–61.  Plaintiff reported generally doing well.  *Id.* at 659.  Plaintiff further reported having "finished one of her online courses and enjoying being back at work[.]"  *Id.*  Treatment records reflect that Plaintiff had difficulty finding balance during the stress of the pandemic, protests, and highly publicized examples of police brutality.  *Id.*  On June 11, 2020, Plaintiff met with Ms. Seeley for a telehealth appointment.  *Id.* at 655–57.  Plaintiff reported that "things are going well" and that she did not have anything to talk about.  AR at 655.  On June 18, 2020, Plaintiff received telehealth services from Ms. Seeley.  *Id.* at 652–54.  Plaintiff was late due to a phone interview for a new job.  *Id.* at 652.  Plaintiff "reported that she had a 'breakdown' on Monday, which involved being emotionally distressed to the point where she was unable to eat or drink for a few hours."  *Id.*  Plaintiff attributed the "breakdown" to stress living with several family members in a small apartment which did not give her sufficient space to be alone.  *Id.*  Ms. Seeley discussed revising/removing redundant diagnoses from Plaintiff's chart leaving Bipolar Disorder

with psychosis as the only diagnosis.  AR at 653.  On June 25, 2020, Plaintiff spoke with Ms. Seeley for an individual therapy appointment.  *Id.* at 649–51.  Plaintiff reported being stable and having another job interview.  *Id.* at 649.  Treatment records reflect that Plaintiff "experienced a re-emergence of a mood/psychosis episode mid-May[,] [and] . . . agreed to start taking psychiatric medication again (had stopped ~fall 2019) and symptoms resolved without the need for another hospitalization."  *Id.* at 650.  On June 29, 2020, Plaintiff received individual therapy via videoconference from Shannon Carmona, LPC through the Banner Health Early Psychosis Intervention Center.  *Id.* at 647–48, 789–90.  Plaintiff reported looking for a new job because she was only working one (1) day per week, which provided insufficient income.  AR at 647, 789.  Plaintiff reported feeling better on her medications.  *Id.*

On July 22, 2020, Plaintiff received telehealth services from Ms. Carmona.  *Id.* at 726–27, 787–88.  Plaintiff reported that she was "doing okay."  *Id.* at 726, 787.  Plaintiff expressed the desire to be independent and noted that she was going to begin a new inbound sales job.  *Id.*  Plaintiff indicated that she "[e]njoys sales and talking to people."  AR at 726, 787.

On August 4, 2020, Plaintiff spoke with Ms. Carmona for individual therapy.  *Id.* at 785–86.  Plaintiff reported doing "pretty good" and noted that she had begun a new job.  *Id.* at 785.  Plaintiff expressed concern that if she does not feel challenged enough in the job, she will want to leave.  *Id.* at 785.  On August 11, 2020, Plaintiff received telehealth services from Ms. Carmona.  *Id.* at 724–25, 783–81.  Plaintiff reported that work had been productive, she was consistently taking her medications, and denied any positive symptoms.  AR at 724, 783.  On August 25, 2020, Plaintiff had an individual therapy telephone call with Ms. Carmona.  *Id.* at 781–82.  Plaintiff reported that she was feeling good and expressed a desire to increase exercise to help manage her depressive symptoms.  *Id.* at 781.

On September 8, 2020, Plaintiff received telehealth services from Ms. Carmona.  *Id.* at 777–78.  Plaintiff reported that things were going well and she had started a new

administrative position for a mattress firm.  *Id.* at 777.  Plaintiff further reported that she was starting her MBA program in approximately two (2) weeks.  AR at 777.  Plaintiff also discussed her mother's health.  *Id.*  On September 22, 2020, Plaintiff spoke with Ms. Carmona for individual therapy.  *Id.* at 774–75.  Plaintiff reported sadness following the death of her Godfather.  *Id.* at 774.  On the same date, Ms. Carmona staffed Plaintiff's case with her treatment team.  *Id.* at 776.  Ms. Carmona noted that Plaintiff was compliant with her medications and denied any positive symptoms of psychosis or mood changes.  AR at 776.  Plaintiff also reported that she had lost her job the previous week "due to a lack of communication."  *Id.*  On September 25, 2020, Plaintiff received telehealth services from Dr. Thienhaus.  *Id.* at 772–73.  Treatment records indicate that Plaintiff had not had a recurrence of psychotic symptoms or mood instability.  *Id.* at 772.  Dr. Thienhaus's examination of Plaintiff was generally unremarkable.  *Id.* at 772–73.  On September 30, 2020, Plaintiff received telehealth services from Ms. Carmona.  AR at 770–71.  Plaintiff reported that she remained unemployed and feeling depressed.  *Id.* at 770.  Plaintiff indicated that she was still taking her medication.  *Id.*

On October 6, 2020, Ms. Carmona received a call from Plaintiff regarding "her fears of not being able to hold down a job."  *Id.* at 769.  Ms. Carmona discussed work programs in the community that are available to her.  *Id*.  On October 14, 2020, Plaintiff received telehealth services from Ms. Carmona.  AR at 767–68.  Plaintiff reported wanting help with maintaining employment.  *Id.* at 767.  On October 20, 2020, Ms. Carmona staffed Plaintiff's case with her treatment team and indicated Plaintiff lost her job due to her mother's health issues and not communicating her needs with her employer.  *Id.* at 765–66.  On October 22, 2020, Plaintiff received telehealth services from Dr. Thienhaus.  *Id.* at 763–64.  Treatment records indicate that Plaintiff was still unsuccessful maintaining employment, but had not suffered a recurrence of psychotic symptoms or excessive mood fluctuations.  *Id.* at 763.  Dr. Thienhaus's examination of Plaintiff was generally unremarkable.  AR at 763–64.  On October 28, 2020, Plaintiff spoke with Ms. Carmona for individualized therapy.  *Id.* at 761–62.  Plaintiff reported depression.  *Id.* at 761.

1    Plaintiff further indicated that she was trying to find a job and had submitted numerous
2    applications without success.  *Id.*

3           On November 11, 2020, Plaintiff received telehealth services from Ms. Carmona.
4    *Id.* at 759–60.  Plaintiff reported that she was doing fine and working with her mother until
5    she can find a job.  AR at 759.  On November 13, 2020, Plaintiff spoke with Ms. Carmona
6    for an individual therapy session.  *Id.* at 757–58.  Plaintiff "reported anxiety associated
7    with past trauma." *Id.* at 757.  On November 24, 2020, Plaintiff received telehealth services
8    from Ms. Carmona.  *Id.* at 755–56.  Plaintiff reported that she was doing well, but not
9    working.  *Id.* at 755.  Treatment records indicate that Plaintiff had not suffered a recurrence
10   of psychotic symptoms or other mood instability.  AR at 755.

11          On December 9, 2020, Ms. Carmona called Plaintiff for a scheduled telehealth
12   appointment; however, Plaintiff had forgotten about the appointment and was unable to
13   meet.  *Id.* at 754.  On December 22, 2020, Plaintiff received telehealth services from Ms.
14   Carmona.  *Id.* at 752–53.  Plaintiff reported that she was doing well, but not currently
15   looking for a job.  *Id.* at 752.  Plaintiff noted that her brother was living with them, which
16   was an adjustment.  *Id*.  On the same date, Dr. Thienhaus completed a Mental Residual
17   Functional Capacity Assessment regarding Plaintiff.  AR at 729–31.  Dr. Thienhaus
18   reported Plaintiff's diagnosis as schizoaffective disorder with symptoms including mood
19   lability and intermittent psychotic episodes.  *Id.* at 729.  Dr. Thienhaus further reported that
20   Plaintiff had no impairment of her ability to understand, remember, or apply information;
21   mild impairment regarding her ability to concentrate, persist, or maintain pace; and
22   moderate limitations on her ability to interact with others, as well as adapt or manage
23   herself.  *Id.*  Dr. Thienhaus opined regarding the percentage of a total work-month that he
24   would expect Plaintiff's symptoms to interfere with her ability to perform work-related
25   functions as follows:   her ability to remember locations and work-like procedures,
26   understand and remember very short and simple instructions, carry out very short and
27   simple instructions, make simple work-related decisions, and travel in unfamiliar places or
28   use public transportation would be impacted less than ten percent (10%) of the time;

Plaintiff's ability to understand and remember detailed instructions, ask simple questions or request assistance, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance, and be aware of normal hazards and take appropriate precautions would be impacted between ten and fifteen percent (10%–15%) of the time; her ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, sustain an ordinary routine without special supervision, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others would be impacted between fifteen and twenty percent (15%–20%) of the time; Plaintiff's ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes and work in coordination or in proximity to others without being distracted by them would be impacted between twenty-one and fifty percent (21%–50%) of the time; and her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods would be impacted fifty-one percent (51%) or more of the time.  *Id.* at 730.  Dr. Thienhaus noted that Plaintiff had been receiving care for at least two (2) years. *Id.* at 731.  Dr. Thienhaus reported that when Plaintiff is faced with changes in environment or demands that were not already a part of her life, she experienced an exacerbation of symptoms and deterioration in functioning.  AR at 731.  On December 29, 2020, Plaintiff received telehealth services from Dr. Thienhaus.  *Id.* at 746–47.  Plaintiff reported that she had not had any recurrence of psychotic symptoms or any major mood instability.  *Id.* at 746.  Dr. Thienhaus's examination of Plaintiff was generally unremarkable.  *Id.* at 746–47.

On January 6, 2021, Plaintiff spoke with Ms. Carmona for an individualized therapy session.  *Id.* at 744–45.  Plaintiff reported that her brother had been staying with her and her mother for approximately one (1) month, which Plaintiff found disruptive.  AR at 744. Plaintiff further reported that she had decided not to pursue her MBA as the classes were

becoming increasingly difficult. *Id.* On January 20, 2021, Plaintiff received telehealth services from Ms. Carmona. *Id.* at 742–43. Plaintiff reported that things were going well. *Id.* at 742. Plaintiff expressed that she enjoys talking to people and likes to be on her feet, moving around. *Id.*

On February 12, 2021, Plaintiff spoke with Ms. Carmona for individual therapy. AR at 740–41. Plaintiff reported experiencing an auditory hallucination while waiting in line at the post office. *Id.* at 740. Plaintiff reported consistently taking her medications, and denied any other auditory hallucinations or intrusive thoughts. *Id.* On February 17, 2021, Plaintiff received telehealth services from Ms. Carmona. *Id.* at 738–39. Plaintiff reported "feeling excited having found a new passion in design and photography." *Id.* at 738. On February 23, 2021, Plaintiff received telehealth services from Dr. Thienhaus. AR at 736–37. Plaintiff reported a brief episode of auditory hallucination while working especially hard helping her mother, but was otherwise asymptomatic. *Id.* at 736. Dr. Thienhaus's examination of Plaintiff was generally unremarkable. *Id.* at 736–37.

On March 3, 2021, Plaintiff spoke with Ms. Carmona for individualized therapy. *Id.* at 734–35. Plaintiff reported that things were "going well." *Id.* at 734. Plaintiff discussed obtaining a Master of Fine Arts in Media Design. AR at 734. Plaintiff expressed that she wanted to find a job. *Id.* Plaintiff noted that she was not afraid of getting hired, but expressed concern that she would not be able to sustain it long term. *Id.*

### b. Reviewing physicians

#### i. *R. Nathan, M.D.*

On July 29, 202, Dr. Nathan performed an initial review Plaintiff's medical records. AR at 89–96, 100–107. Dr. Nathan considered Plaintiff's impairments to include depressive, bipolar, and related disorders, and anxiety and obsessive-compulsive disorders. *Id.* at 90, 101. Dr. Nathan opined that if the bipolar diagnosis is correct, Plaintiff would likely continue to improve with continued medication and no drug or alcohol abuse; however, if Plaintiff is schizoaffective, as initially thought, she would likely become less functional. *Id.* at 91, 105.

- 15 -

1

*ii.*     *E. Campbell, Ph.D.*

2     On August 13, 2020, on reconsideration, Dr. Campbell opined that "[Plaintiff] does

3    not allege worsening of Y conditions[,] [and] [the] M[edical] E[vidence] [of] R[ecord]

4    shows improvement and that she is working." AR at 124, 136.

5                **3.    Vocational Expert Ruth Van Vleet's Testimony**

6     Ms. Van Vleet testified as a vocational expert at the administrative hearing.  AR at

7    30, 63–66.  Ms. Van Vleet described Plaintiff's past relevant work at Sprouts as a deli

8    clerk.  *Id.* at 64.  Ms. Van Vleet reported this position as Dictionary of Occupational Titles

9    ("DOT") number 316.684-014, unskilled, and with a Specific Vocational Preparation

10   ("SVP") of 2.  *Id.*  Next, Ms. Van Vleet described Plaintiff's past work in customer service

11   at a call center as telephone solicitor or customer service representative, DOT number

12   299.357-014, with an SVP of 3, semiskilled, and sedentary exertional level.  *Id.*  Ms. Van

13   Vleet described Plaintiff's past work as a customer order clerk, DOT number 249.362-026,

14   with an SVP of 4, semiskilled, and sedentary exertional level.  *Id.*  Ms. Van Vleet described

15   Plaintiff's past work at Caption Call as somewhat close to a telecommunications operator,

16   DOT number 203.582-050, with an SVP of 4, semiskilled, and sedentary exertional level.

17   AR at 64.  Regarding Plaintiff's past work at AmeriCorps, Ms. Van Vleet described a tutor

18   position, DOT number 099.227-034, an SVP of 7, skilled, and light exertional level.  *Id.*

19   Finally, Ms. Van Vleet described Plaintiff's past work as a manager trainee, DOT number

20   189.167-018, with an SVP of 6, skilled, and light exertional level.  *Id.*

21     The ALJ asked Ms. Van Vleet to consider a hypothetical individual of Plaintiff's

22   age, education, and work history; who is limited to simple, routine tasks involving simple

23   work related decisions and occasional changes in the work setting; and who can frequently

24   interact with supervisors, coworkers, and the public.  *Id.* at 64–65.  Ms. Van Vleet opined

25   that such an individual would be unable to perform Plaintiff's past work.  *Id.* at 65.  Ms.

26   Van Vleet further opined that such an individual would be employable as a housekeeper,

27   cleaner, or janitor, DOT number 323.687-014, with an SVP of 2, unskilled, light exertional

28   level, and of which there are up to 220,000 jobs in the national economy.  AR at 65.  Ms.

Van Vleet also opined that such an individual would be employable as a paper pattern folder, DOT number 794.687-034, with an SVP of 1, unskilled, light exertional level, and up to 5,400 jobs in the national economy.  *Id.*  Finally, Ms. Van Vleet opined that such an individual would be employable as a dishwasher, DOT number 318.687-010, with an SVP of 2, unskilled, medium exertional level, and approximately 194,000 jobs in the national economy.  *Id.*

The ALJ then asked Ms. Van Vleet to modify the characteristics of the hypothetical individual to only occasional interaction with supervisors, coworkers, and the public.  *Id.* Ms. Van Vleet opined that even with the further restriction, such an individual would be able to perform the janitor, paper pattern folder, and dishwasher jobs that she had previously described.  *Id.*

Ms. Van Vleet testified that based upon her experience and contact with employers, such a hypothetical individual would typically sit less than five (5) minutes per hour.  AR at 65.  Ms. Van Vleet further testified that such an individual who was off-task five (5) percent of an eight (8) hour workday would be able to perform those jobs if that individual were able to stay in their workplace and change from task to task.  *Id.* at 65–66.  Ms. Van Vleet also opined that if such an individual was twenty (20) percent off task, they would not be able to maintain competitive employment.  *Id.* at 66.  Ms. Van Vleet opined that based on her experience with labor market research and placing individuals in jobs, it was unlikely that ten (10) to fifteen (15) percent of the time off task would be tolerated by an employer.  *Id.*

## II.   STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error.  42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).  This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record

as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

## III.   ANALYSIS

### A.   *The Five-Step Evaluation*

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows:  Step One asks is the claimant "doing substantial gainful activity[?]"  20 C.F.R. § 404.1520(a)(4)(i).  If yes, the claimant is not disabled.  Step Two considers if the claimant has a "severe medically determinable physical or mental impairment[.]"  20 C.F.R. § 404.1520(a)(4)(ii).  If not, the claimant is not disabled.  Step Three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  20 C.F.R. § 404.1520(a)(4)(iii).  If not, the claimant is not disabled.  Step Four considers the claimant's residual functional capacity and past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If claimant can still do past relevant work, then he or she is not disabled.  Step Five assesses the claimant's residual functional

capacity, age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(v).  If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled.  *Id.*

In the instant case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 27, 2020.  AR at 32.  At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: bipolar I disorder with psychosis (20 CFR 404.1520(c) and 416.920(c))."  *Id.* at 33.  At step three, the ALJ further found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)."  *Id.*  Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: simple, routine tasks involving simple work related decisions and occasional changes in the work setting[,] [and] [s]he can frequently interact with supervisors, coworkers, and the public."  *Id.* at 34.  At step four, the ALJ found that "the claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965)."  *Id.* at 37.  At step five, the ALJ found that after "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 404.969(a))."  *Id.* at 38.  Accordingly, the ALJ determined that Plaintiff was not disabled.  AR at 39.

## B.  *Plaintiff's Symptom Testimony*

Plaintiff asserts that "[t]he ALJ has failed to identify any clear and convincing reasons . . . supported by substantial evidence for disregarding symptom testimony[,] [and] . . . has failed to account for all factors of the other evidence apart from objective medical evidence."  Opening Br. (Doc. 18) at 17.  Defendant argues that the ALJ "reasonably discounted Plaintiff's subjective complaints" and "Plaintiff is effectively asking this Court

1   to reweigh the evidence in a light more favorable to her."  Response (Doc. 19) at 3, 12.

2   Defendant further argues that even if the ALJ erred, such error was harmless.  *Id.* at 12.

3   The Court agrees with agrees with Respondent and finds the ALJ provided clear and

4   convincing reasons for discounting Plaintiff's testimony.

5                   **1.**  **Legal Standard**

6         An ALJ must engage in a two-step analysis to evaluate a claimant's subjective

7   symptom testimony.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007).  First,

8   "a claimant who alleges disability based on subjective symptoms 'must produce objective

9   medical evidence of an underlying impairment which could reasonably be expected to

10   produce the pain or other symptoms alleged[.]'"  *Smolen v. Chater*, 80 F.3d 1273, 1281–

11   82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*)

12   (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir.

13   2014).  Further, "the claimant need not show that her impairment could reasonably be

14   expected to cause the severity of the symptom she has alleged; she need only show that it

15   could reasonably have caused some degree of the symptom."  *Smolen*, 80 F.3d at 1282

16   (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017).  "Nor

17   must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the

18   severity thereof.'"  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting

19   *Smolen*, 80 F.3d at 1282).  "[I]f the claimant meets this first test, and there is no evidence

20   of malingering, 'the ALJ can reject the claimant's testimony about the severity of her

21   symptoms only by offering specific, clear and convincing reasons for doing so.'"

22   *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v.*

23   *Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and

24   convincing" requirement had been excised by prior Ninth Circuit case law).  "This is not

25   an easy requirement to meet: 'The clear and convincing standard is the most demanding

26   required in Social Security cases.'"  *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r*

27   *of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

28

SSR 16-3p[8] states, in relevant part:

> We will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled.  We will evaluate an individual's symptoms based on the evidence in an individual's record as described below; however, not all of the types of evidence described below will be available or relevant in every case.
>
> * * *
>
> In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent."  It is also not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, *available at* 2017 WL 5180304, at *5, 10 (October 25, 2017).  "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'"  *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012), *superseded by regulation on other grounds* (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).  Plaintiff "bears the burden of proving that an impairment is disabling."  *Miller v. Heckler*, 779 F.2d 845, 849 (9th Cir. 1985) (citations omitted).

### 2. Analysis

The ALJ acknowledged the two-step process for assessing Plaintiff's symptom testimony.  AR at 34–35.  Next, the ALJ described Plaintiff's responses on the administrative forms and recounted her hearing testimony.  *Id.* at 35.  The ALJ then

---

[8] Social Security Rulings are "binding on all components of the Social Security Administration."  20 C.F.R. §§ 402.35(b)(1) and (2); *Heckler v. Edwards*, 465 U.S. 873 n.3, 104 S. Ct. 1532, 79 L. Ed. 2d 878 (1984).3

1   concluded "[a]fter careful consideration of the evidence, the undersigned finds that the

2   claimant's medically determinable impairments could reasonably be expected to cause the

3   alleged symptoms; however, the claimant's statements concerning the intensity,

4   persistence and limiting effects of these symptoms are not entirely consistent with the

5   medical evidence and other evidence in the record for the reasons explained in this

6   decision." *Id.* at 35.  The ALJ went on to review Plaintiff's medical records and other

7   evidence in the file.  *See id.* at 35–36.

8                              **a.  Improvement with medication**

9           Plaintiff asserts that her 2019 mental breakdown "is clearly evidence of severe

10   mental illness."  Pl.'s Opening Br. (Doc. 18) at 12 (citations omitted).  Plaintiff

11   acknowledges that "her condition improved with medication[,] [but] . . . contend[s] [] that

12   she is not yet at a point where she can return to the workforce on a regular and continuing

13   basis."  Pl.'s Reply (Doc. 23) at 1–2.  The ALJ observed that "[c]onsistent with the

14   claimant's testimony regarding symptom stability with medication and therapy, behavioral

15   health records show no signs of major mood instability and no recurrence of psychotic

16   symptoms[.]"  AR at 35 (citations omitted).

17          Plaintiff alleges an onset date of June 27, 2020.  *See, e.g.,* AR at 30.  At the time of

18   her alleged onset, Plaintiff was receiving regular behavioral health treatment.  *See* Factual

19   Bkgd., Section I.B.2., *supra*.  On May 12, 2020, Dr. Thienhaus stressed the importance of

20   early intervention and restarting her medications that induced remission last time, and his

21   observations of Plaintiff were generally unremarkable.   AR at 669–70, 792–93.

22   Subsequently, Plaintiff "reported [to her therapist] that she [wa]s feeling 'better' after

23   having re-started risperidone and lithium."  *Id.* at 666.  Treatment records further reflect

24   that Plaintiff "experienced a re-emergence of a mood/psychosis episode mid-May[,] [and]

25   . . . agreed to start taking psychiatric medication again (had stopped ~fall 2019) and

26   symptoms resolved without need for another hospitalization."  *Id.* at 650.  Throughout the

27   remainder of 2020, Plaintiff consistently reported doing "good," "well," or other positive

28   descriptor to treatment providers.  *See* AR at 647, 655, 659, 662, 664–65, 726, 752, 755,

759, 777, 781, 785, 787, 789.  In February 2021, Plaintiff reported experiencing an auditory hallucination or intrusive thought while waiting in line at the post office, and once while working especially hard helping her mother.  *Id.* at 736, 740.  Other than these two episodes, once on medication Plaintiff remained asymptomatic.  *See id.* at 736, 740, 746, 755, 763, 772, 776.

"Impairments that can be controlled effectively with medication are not disabling[.]"  *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).  The ALJ reasonably found that Plaintiff's symptoms were controlled with medication.

### b.  Work and school

The ALJ observed that Plaintiff's "[b]ehavioral health records from June 2020 note the claimant was making good progress with her goals, getting along well with co-workers, and going on job interviews for a new position with more hours[.]"  AR at 35 (citations omitted).  The ALJ further noted that "[b]y July 2020, the claimant obtained a new job in sales, working from home[,] . . . [and] reported that she enjoyed talking to people and described her work as productive."  *Id.* at 35–36.  The ALJ also considered Plaintiff's applications to, and participation in, various graduate programs, as well as her reports of working with employment services to find a new position.  *Id.*  The ALJ determined "[s]uch evidence suggests that the claimant can adapt and manage to occasional changes in a work setting, simple work-related decision making, and frequent interactions with co-workers, supervisors, and the public."  *Id.* at 36.

Plaintiff "does not dispute that she is grossly capable of such activities for a time; however, she contends that she is not capable of maintaining such activities on a regular and continuing basis."  Pl.'s Opening Br. (Doc. 18) at 17.  Plaintiff further contends that her "history of short-lived work activity, marked by a pattern of finding reasons for leaving or giving her employer reasons to terminate her overlaying bipolar disorder that reduces her ability to maintain attention and concentration on a regular continuing basis, is not a clear and convincing reason to disregard her consistent symptom testimony."  *Id.*

Indeed, the ALJ considered that "[w]hile [Plaintiff] testified that she has trouble

- 23 -

keeping a job, the record does not show that her job losses were related to her bipolar disorder."  AR at 36.  This conclusion is supported by the record.  "Even where th[e] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."  *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (citations omitted), *superseded by regulation on other grounds*.  The ALJ reasonably found that Plaintiff's reports of debilitating mental health symptoms unsupported by the record.  Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ."  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).

### c.  Stress Management

The ALJ also considered Plaintiff's ability to manage stressors.  AR at 36.  The ALJ noted that "[d]uring June 2020, [Plaintiff] reported increased stress from her crowded living situation [and] her job that did not provide enough work hours[.]"  *Id.* (citations omitted).  The ALJ observed that "[d]espite this stress, [Plaintiff's] symptoms remained stable with medication, without any negative side effects."  *Id.*

The ALJ reasonably concluded that Plaintiff's ability to manage stressors was inconsistent with her reports of totally disabling mental health symptoms.  Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ."  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).

### C.    *Medical Opinion Evidence*

Plaintiff asserts that "[t]he ALJ's analysis of opinion evidence of record fails to adequately address the factors of supportability and consistency in a manner that is supported by substantial evidence."  Pl.'s Opening Br. (Doc. 18) at 20.  The Court finds that the ALJ properly considered the medical opinion evidence.

1

### 1. **Legal Standard**

Section 404.1520c, 20 C.F.R., governs the analysis of medical opinions for disability claims filed on or after March 27, 2017.  "Under the revised regulations, 'there is not an inherent persuasiveness to evidence from [government consultants] over [a claimant's] own medical source(s), and vice versa.'"[9]  *Woods v. Kijakazi*, 32 F.4th 785, 791 (9th Cir. 2022) (alterations in original) (quoting Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. at 5844)).  Rather, medical opinions are evaluated pursuant to the factors set forth in Section 404.1520c(c)(1)–(5), with the most important factors being supportability and consistency:

> (1)     *Supportability*. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical findings(s) will be.

> (2)     *Consistency*. The more consistent a medical opinion(s) or prior administrative medical fining(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 404.1520c(c); *see also* 20 C.F.R. § 404.1520c(b)(2).  The regulations specifically require the ALJ to explain how he or she considered supportability and consistency in evaluating medical opinions and making the disability determination.  20 C.F.R. § 404.1520c(b)(2).  Additionally, the ALJ may, but is not required to, consider other factors such as the medical source's relationship with the claimant, the medical source's area of specialization, or "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  20 C.F.R. 404.1520c(c)(3)–(5).

---

[9] The Ninth Circuit Court of Appeals has held that its previous "requirement that ALJs provide 'specific and legitimate reasons' for rejecting a treating or examining doctor's opinion . . . . is . . . incompatible with the revised regulations.  *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

2.  **Analysis**

The ALJ summarized Dr. Thienhaus's Mental Residual Functional Capacity ("MRFC") Assessment regarding Plaintiff and contrasted it with inconsistencies with his own treatment notes, as well as Plaintiff's hearing testimony.  AR at 36–37.  As an initial matter, the ALJ observed that Dr. Thienhaus's MRFC Assessment was on a checkbox form.  The Ninth Circuit has held "that the ALJ may 'permissibly reject[] . . . check-off reports that [do] not contain any explanation of the bases of their conclusions.'"  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (alterations in original) (quoting *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996)), *superseded by regulation on other grounds*.  Plaintiff focuses on Dr. Thienhaus description of "intermittent" psychotic episodes in the MRFC to demonstrate that his opinion was not inconsistent; however, this does not account for Dr. Thienhaus's repeated unremarkable mental status examinations of Plaintiff.  Plaintiff further objects to the ALJ's observation that Plaintiff "has sustained the concentration, persistence, and pace to complete coursework online."  *Compare* AR at 37, *with* Pl.'s Opening Br. (Doc. 18) at 20.  Plaintiff's inability to pass her graduate level accounting class does not negate the ALJ's finding.

Plaintiff further objects to the ALJ's consideration of the State-agency medical consultant's opinions, asserting that "none of the[] background assumptions and considerations [are] supported by substantial evidence."  Pl.'s Opening Br. (Doc. 18) at 20.  Contrary to Plaintiff's argument, however, the Court finds that the ALJ properly summarized and considered the State-agency physician testimony.

Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotations and citations omitted).   The Court finds that the ALJ properly analyzed the medical opinion evidence of record, and the ALJ's findings are supported by the record.

. . .

. . .

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.     CONCLUSION**

Based on the foregoing, the Court finds the ALJ properly assessed the medical opinion evidence of record and Plaintiff's symptom testimony.  Plaintiff "bears the burden of proving that an impairment is disabling."  *Miller v. Heckler*, 779 F.2d 845, 849 (9th Cir. 1985) (citations omitted).  Plaintiff has not met her burden in this case.

Accordingly, **IT IS HEREBY ORDERED** that Plaintiff's Opening Brief (Doc. 18) is **DENIED**, and the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly.

Dated this 26th day of September, 2023.

Eric J. Markovich
United States Magistrate Judge